Next case. CASE 14-0548, First Chicago Insurance v. Michael Moldo. Next case is CASE 14-0549, Second Chicago Insurance v. Michael Moldo. Next case is CASE 14-0548, First Chicago Insurance v. Michael Moldo. Next case is CASE 14-0550, Second Chicago Insurance v. Michael Moldo. Would the attorneys that are going to present argument please step up and identify yourselves for the record. Good morning. Jim Newman for First Chicago. Mr. Newman. William Lazarus for Noah Wilson. Mr. Lazarus. Good morning to each of you. Each side will have approximately 15 minutes to present oral argument. And from that, Mr. Newman, you may save out some time for rebuttal. Three minutes, please. All right. Please step up and proceed. Thank you, Mr. Court. My name is Jim Newman. I represent First Chicago Insurance Company. This is the second time this case has come before the appellate court. First time it came up to the appellate court. On a summary judgment. On a summary judgment, yes. And this court reversed the summary judgment in favor of First Chicago and remanded for determination on factual issues regarding agency. And since that remand, an amended complaint was filed. The case went to bench trial. Bench trial lasted approximately four hours or so. And the trial judge gave a written opinion, which is part of the record. Yes. And found basically that there was coverage. Before I get into the facts, I know you have all read the briefs. I'm going to point out that there were four people that testified at trial. And this is going to become important in the arguments that I'll make here. The first is the insured noble who testified. The second is Zintac, who was a First Chicago claims judge. He was a primary witness for First Chicago and discussed the policy. Third witness was Harrison, who was the president and owner, I believe, of Metrolift, who was the insured, the named insured under the First Chicago policy. And then there was Mr. Gettemann, who was the former president of First Chicago. The issue in this case, or the issues in this case, I think are set forth adequately in the briefs. The one thing I wanted to talk about first was burden of proof, because my briefs talk about that quite a bit, not only in my opening brief, but probably more in my reply brief. This is kind of an odd case to a certain degree, because our position in that of First Chicago was that this policy never, there's no coverage under this policy for a couple of reasons. One, the individual involved in the accident driving the car was not an insured. That doesn't trigger coverage. And two, which is the issue that came up the first time, was whether or not there was adequate notice. The facts that were developed at trial from these four witnesses were not in dispute. There really isn't any factual dispute at all. There were no witnesses that contradicted each other. Many of the facts were stipulated, too. But the burden of proof is important, because what I, what First Chicago approved at trial, which is what there was as a plaintiff in the declaratory action, was we identified the policy, we presented the policy and evidence, and then we identified the parties that were involved in this accident. Mulga and the other defendants, I'll just refer to them all collectively as defendants, had several affirmative defenses, which is what this case was tried for. And I'll address those right now. The first was, I don't want to call it an affirmative defense. Mulga claims that he was an insured under the policy. And as my brief points out, he's not a named insured under the policy. And an insured is defined by the policy. It's not something that one would just make up or something that the court has to guess. It's defined on page, in the record, on page 2 of 11 of the policy, which is my exhibit, I think exhibit 1 attached to my brief. And it defines an insured. And it says, you, for any covered auto. And you is defined as First Chicago. So on the first page it says, you means the named insured. And the second one is anyone else while using your, with your permission, a covered auto. And this comes down to whether or not this vehicle was a covered auto. It was not. It was not an owned automobile. It was not a non-owned automobile. And there's been some, there was an argument made in the response brief, in this case, that this was a non-owned automobile. What about the issue that the automobile actually was being used for the purposes of the business? There's no, there is no type of coverage for that. And in fact, well, I should say there's no type of coverage purchased for that. As Mr. Zintak testified, if you wanted to have coverage that covered anyone operating the business, there was a specific type of coverage for that. And they didn't, and Metrolink didn't purchase it. So there was coverage for such a thing available, but not in this policy. And that, that's why this was not a non-owned automobile, because he's arguing there, it's not an automobile, therefore it's covered. That's not what the definition of non-owned automobile says. And if the court were to try to construe it that way, it would render all of the other seven categories that are vehicles superfluous. Because there are seven types of coverage one could purchase here. And there's an owned, and there's a non-owned, and then there's, we cover any automobile used in your business. They didn't purchase that. That's more expensive, as was testified to. So this case, if I were to summarize the facts of this case in a simple way, which is most beneficial to my client, you know, obviously, would be that First Chicago didn't insure the driver. We didn't insure the car. We didn't insure the car's owner. Three of those are strangers to the First Chicago policy. Has the phrase, your employee, if the covered auto is owned by that employee or a member of his or her household, has that been interpreted against you in the cases already reported? No. And that doesn't apply here. It doesn't. Well, Isn't he an employee? Mr. Let's see. You're reading section who you insured under B? Yeah. But you're missing the most important, two things here. The most important word is has an except there, which means this is an exception. Right. And two, this car wasn't owned by the employee, by Mr. Melvin. Or a member of his household. Was not owned by a member of his household. It was owned by his mother who did not live in the household. Has your narrow interpretation been interpreted against you in any case? No. And I don't know, under the facts of this case, it's not suggested that that would even apply, because the car was owned by his mother, and the mother didn't live in the household. And those facts, and it says any more than I'll use your permission, a covered auto will be owned by your except an employee. How did the trial court interpret that this was a covered auto then? Honestly, if you read the opinion, I had to study, but I don't know. Can you guess for us? Give us a guess. I'm sorry? Give us a guess as to why the judge thought this was a covered auto. I think as Justice Reeves, I think what the court did, and the court did incorrectly, was he was an employee, and therefore he's covered, and skipped the analysis, skipped the definitions under the policy, skipped the type of coverage that are afforded, skipped the case law. How in our previous opinion, then, did we say there was a question of fact regarding whether this was a covered auto? It was not raised in the first appeal when summary judgment was granted because of the notice issue. All right. And when that notice issue, the notice issue, there were two other cases pending that resolved around the same time as the appeal. And that's what we'll talk about to you right now. I'll just skip ahead. MetroLift, as the name ensured, was a named defendant, was added as a named defendant to the underlying DI case. Yes. They were dismissed from the case with prejudice. I believe that case went up on appeal, if I'm not mistaken. It was affirmed on appeal, if I'm not mistaken. But they're out of the case. Then, Mulder then sued MetroLift under the identification theory. Hey, I was working for you at the identity. He lost that issue, too. MetroLift, as a result of that, has zero liability in the case. In other words, there is no culpability that Mulder is out there a persona non grata in the case that is still pending, the viral injury case. Because whether he was in court or not doesn't matter because MetroLift cannot have any exposure. There's no liability. It's gone. And that's the reason why that's the slight change in the case from this appeal to the previous appeal. The court found, actually, that Mulder was not an insurer that was defined by the policy. And I'm talking about the first appeal. I think they used the word other insurer, potentially. And that has to do with notice. There were no facts developed in the underlying case at all, originally, about whether or not he qualified as an insurer. It was never an issue before the trial court. It was never an issue before this court. Well, tell me this. How do you get around Pekin v. Benson? The case of Pekin v. Benson. I'm still in my mind about the issue on that. It's the same issue as you have here. On what? I mean, their relationship. That's what you're after, people. The issue that you're talking about, that he was not an insurer. He's not an insurer. To determine whether he's an insurer or not, you have to look to the policy. There's been interpretations. And, you know, I'm talking about a particular case. Are you telling me you don't know that particular case? I've read every case that's in this thing, but there are so many cases, Judge. I apologize. I may not know the particular facts. If you remind me of the facts, I will then proceed. I will tell you, Judge, that if we're talking about the cases, and there are several cases. Whether it's a covered auto is what it's about. Isn't that what you're referring to? In this case, hasn't it been interpreted against you, limiting this particular provision, your employee, if the covered auto is owned by that employee or a member of his or her household? As I responded first to that, this provision doesn't even apply here, because from a factual standpoint, that's not what this case is. This case, the car here was owned by the mother who did not live in the same household. Was there testimony in that regard? Yes, there was. There was testimony from Mr. Mulder. And I wrote a writing report, which goes back to the very first thing I said here. Burden of proof. And this is really important. I, or I should say First Chicago, is not required to prove anything. In fact, all of the issues that are before this Court right now, the burden of proof is actually on the defendants. They have to prove that they're insured and that the loss occurred within the confines of the policy. I point out in my brief, astonishingly, the Court made a finding that there was coverage. And yet— Coverage? Duty to defend and— Duty to defend and duty to identify. As this Court is, I'm sure, well aware, the eight-corner rule is sometimes referred to as the four-corner rule. You compare the insurance policy to the four corners of the complaint. That's how any judge, any court, determines whether or not a coverage is triggered under a policy. The court, however, did not do that. And why do we know that? Because it never had a copy of the complaint before. And it doesn't make any reference of that. And it's in his opinion, the Court's opinion. The Court made a determination that there's coverage without doing exactly what the Court, this Court, and the Supreme Court has required the trial court to do, which is compare the eight corners, four corners of the complaint to the four corners of the policy. That wasn't done here. The other issue which I'm going to go to is the agency issue, which I think is a very, very easy issue. Again, the burden of proof, as I set forth in my brief, is on the person claiming the agency to prove the agency. Well, the agency issue is clearly we're reviewing for manifest way to the evidence, are we not? And isn't this an implied agency case? Or a parent, rather. It's interesting because, again, this is one of those things that I don't know because they didn't present any evidence at trial. I point out in my brief and I've set out to the record that it's very clearly there wasn't even an argument made that there was an actual agency. No, it was a parent. And there was an agreement. So if we're going to talk about a parent agency, one of the first issues that needs to be proven for a parent agency is reliance. The case law is very, very clear on that. In this case, they can't prove a reliance. In fact, the exact opposite is true. Mr. Harrison, who is the only person that testified for MetroNet, testified that he did not believe Associated Works for First Chicago. Let me ask you about the trial court's finding that there was agency. The trial court referred to prior circumstances. And so are we talking about prior circumstances between the parties or are we talking about prior circumstances in other matters with relations to First Chicago and Associated? Where I understood the trial court in the ruling and the evidence that was presented at trial, because I was the trial attorney on the case, is the previous incidences that there were accidents by MetroNet. And I think there were eight total for Chicago since First Chicago occurred. And that there were reports made by Associated for those accidents. But there were four reported by MetroNet directly and four were done by Associated. One of the things in this case that remained, the court said, we need to have it. There's a factual question regarding agency. Those questions have been answered unequivocally at this trial. You have MetroNet testifying that First Chicago, that he wasn't aware of any relationship between Associated and First Chicago, and that he viewed Associated as his own agency and not that of First Chicago. The inquiry is over at that point because it's a parent agency and you have to have reliance on a parent agency. It's the very first thing you have to prove. The only person that testified regarding this issue was Mr. Harrison. And Harrison said unequivocally, I got together with Associated and we agreed not to tell First Chicago because it would increase our rate of premium. And I didn't want to have my premium increased. So it was an intentional, knowing decision that he made. I have to go back to something that we talked about earlier. You said that there was no coverage for non-owned autos? No, this doesn't qualify as a non-owned auto by the definition. All right. So the provision schedule 9 states non-owned autos only. And then it says only those autos, you, that would be MetroLift, do not own, lease, hire, rent, or borrow that are used in connection with your business. So first of all, there was coverage for vehicles that MetroLift didn't own that were used in connection with your business. Do you agree with that at least? I would agree that there would be coverage if it was used in, yes. And the problem is used in the business was never, that fact was never developed. Well, wait a minute. What did Mulder say? How did this accident occur? Mulder said that he was driving to a job site. That is the extent of his. Do you think that the court's finding that is against the manifest weight when he testified he was driving to a job site? Absolutely. Because the case law says. This is a better strike. And the court found that there was coverage. And they're arguing in response that the court concluded there was coverage under the non-owned autos section. They paid for that. Schedule 9. But wait. There's more. This includes autos owned by your employees or partners or a member of their households but only while used in your business or your personal affairs. Yes. All right. So for purposes of a duty to defend, the court has to interpret an ambiguous provision in favor of coverage, doesn't it? It would. All right. And you're saying there's nothing ambiguous about this? This includes autos owned by your employees or partners or members of their households but only while used in your business or your personal affairs. Two issues there. One of them is that he owned the automobile. The second one was the issue of whether it was used in the business. And I've cited case law. It does say this includes, meaning that there's more than simply this. Correct. But you also have to remember, Your Honor, that you have to interpret the policy as a whole. Yes. And that gets back to the other descriptions of automobiles. This, Mr. Zitak testified, and I think this court, it's the court's promise to interpret this. But if this car falls into one of these other categories, which it does, you've got to consider that as to whether or not the non-owned aspect applies here. I cited case law, and there are two points I want to make. I cited case law that talks about driving the car to work. And the court said that that is not used for business purposes. That's not what that term means. Which term? Used for business purposes. He was driving it to where he works at. He testified that that's the extent of the evidence. Now, if there was a record made that he used his car on a regular basis as part of his job structure, that was his duties to do that? That wasn't the testimony. He said he was going to a job site. He literally drove it to a job site. And the only other thing that was testified to on that issue was Metro. The Metro testified, Mr. Henderson testified, that Voyner told him that he was going into or leaving a McDonald's and got involved in an accident. And you think that used in connection with your business wouldn't include this testimony that someone was on their way to a job site? I do not. I don't think that is sufficient to trigger that. What is? When does the, in connection with your business, start? Once he gets there? If he's actually doing it at the direction or request of the employer, there was no evidence presented. I asked the court to read the transcript. But what case says that it has to be at the direction of the employer? What case would you cite for us? The case that I cited in my brief on this issue is, I think, directly on point on this. Okay. If I don't find it, I'll give you a second in my reply because I knew I had it in my brief and it's a case that stands directly for that proposition. But Mulder said a little more than what you've described. He said he was employed by Metrolift, that at the time of the accident he was heading to a construction site for Metrolift, and that after the accident the car Mulder was driving was a total loss and that the vehicle was towed. So that's the extent of it. All right. That is the extent of it. And I don't believe that that's enough on the case that I cited. But I know I have a finite amount of time here. I want to talk about the agency issue. Yes. Go forward. The agency issue is something that I think is very clear-cut. That record has been established. There aren't any questions about the time frame or anything along those lines. The issue in front of the trial judge, an issue, again, before the Suprema Court, which was always related, is associating the agent of Metrolift or the agent of First Chicago. I didn't know this. What was his name, Mr. Harrison? Mr. Harrison was Metrolift, yes. Didn't he testify that it was the practice to notify any claims to the agency, not to First Chicago? Isn't that how they operated their business for years? No. Harrison would call this gentleman, and didn't he actually confirm that, Mr. I think his name began with a B, from the agency. Yes. Yes. He had big squids or something. He did say that he did that. The records indicate out of the eight claims, First Chicago reported four of them and Associated reported four of them. But what Mr. Harrison testified to is that he would call Associated, whom he, again, he testified, I believe, he says, I believe Associated worked for us. Those are his words. He works for us. He knew of no relationship. He was asked, are you aware of any relationship between First Chicago and Associated? He said no. What about the issue that Associated's name, address, and phone number were contained on First Chicago's policies? No, none of the policies are on the debt page. It is on every debt page of every insurance company that sells third parties. In fact, actually, even if it was a captive insurance company, you can look at every file you have, and the broker is going to be on the debt page. That's the identity of the person who sold the policy. That's it. As a broker, then, therefore, don't you create an appearance of an agency relationship? No. He's an independent producer. So we don't even have to, there's a whole analysis that we have to go through, but the very first test for a parent agency is reliance. Without reliance, the court said, you can't have a parent agency. There can be no argument, I'd love to hear it, on any type of reliance that Associated had or that Metrolinx had. Metrolinx had zero contact with, or, excuse me, Associated, or Mulder, let me back up, Mulder had no contact at all with First Chicago or Metrolinx. Mulder, therefore, can't testify. I rely upon this. He's the person driving the car. The injured party had no contact, didn't testify. There's no evidence that they, so you've eliminated those two from any type of reliance. So who's making a suggestion here that there was an apparent agency? The only two parties left in the equation is Associated and First Chicago. First Chicago testified, Associated was an independent agent, and nobody's supposed to be now. But Associated testified, we didn't know, or Associated testified, excuse me, strike that, Associated didn't testify. Metrolinx testified, that's the issue. Metrolinx testified that they were unaware of any relationship between Associated and First Chicago. And because of that, there could never be any reliance. How could they rely upon something that I'm telling you Associated, and it's going to go to First Chicago as a parent agency requires, if they were unaware of any relationship. Because they were unaware of that, there could never be reliance. On top of that, you have Associated testifying under oath that they believed, or excuse me, Metrolinx testifying under oath, that they believed Associated was their own agent. Metrolinx never provided any evidence to remotely suggest that they thought anything that they were doing vis-a-vis Associated was going to First Chicago. Let me ask you a question. Would you agree that an independent broker is an agent for the company as to notes? No, absolutely not. You say they're not. For purposes of when you are using them. Let me ask you, are you giving notes or receiving notes? Because there's a difference, and that seems to be where some confusion is. Are you receiving notes? Absolutely not. Okay. But in instances where the insurer notifies their broker, and the company is aware of that, and allows that to be, isn't that sufficient? No. What case can you rely on that says that? Because the cases that I cited in my brief, no reliance. No case says what you just said. Okay. Let me back up again and say the First Chicago was not required to prove the negative. I understand you asked that question. I'm going to try to answer it. But you're putting a burden on me to prove the negative. I'm not talking about burdens because here there was testimony that on prior occasions the broker received notice, gave the notice to the company, and the company reacted that way and expected it to be done that way. That's not what the testimony showed. You're talking about John Gediman's testimony. John Gediman testified that they had received notice from Associated on four cases in the past. Okay. Because Associated was their agent, and he made it very clear across examination. He said if MetroLift tells Associated, who is their agent, Associated is required to give that information to MetroLift. I cited probably ten cases in my brief, in my reply brief, that stands for that proposition. There is no question that everybody testified that that information never came to First Chicago. And there's also no question that it was purposely not given to First Chicago. And the case law says even if there was an apparent agency relation, so even if you find that, if you find, based upon the evidence, that the Associated, I'll use the word conspired, agreed with MetroLift not to give it to First Chicago, then it's not imputed to First Chicago. I cited a dozen cases that stand for that proposition. It's very clear. You cannot have an apparent agency because an agency is based upon the ability of the agent to do the bidding of the principal. And it's not the bidding of the principal he lies to. And that's why you don't have an apparent agency here. Well, you see, here is where I think you're going wrong. When your company allows the broker to be able to intervene and provide notice, take accident reports, and do all of that, that is apparent agency. There is no accident reports that have been taken. There's been no testimony anywhere in that record. What did Harrison tell Associated about this particular incident? He said he was involved in an accident and that the person driving the car was employed by him because he had his own insurance and that he had tendered it, which is another issue. Mulder had tended it to his own insurance company, which I believe is State Farm, and State Farm was defending the case, which, by the way, I'll point out, that at no time in this case from day one to the present has Mulder ever tended to the defense of this case to First Chicago. They have tended it to State Farm, and State Farm has been defending it as far as I know without reservation of rights. But I'm going to address your question. There was never an accident report taken by law, as I'm sure any of mine on previous occasions. Never. There was no testimony that that was ever done. But more importantly, Judge, I can say this. If you look at the totality of all of the case law on the issue of notice, and I pointed this out in my brief and I pointed it out in the trial court, it has never been First Chicago's position that Associated couldn't give notice to First Chicago because this Court and the Supreme Court have said anyone can give notice. Anyone. A person on the street can give notice. And it doesn't make them an agent. It doesn't make them an agent. For purposes of the… For purposes of… It has never been the position of First Chicago that we had to get notice from a specific person. It's the position of First Chicago that we have to get notice, period. And in this case, there is no doubt that the notice was not given to us, and it was not given to us intentionally. This is the equivalent of, in this case, of Metrolinx handing to Associated a sealed envelope with an accident report and saying, I'm giving you notice of an accident, but don't open it. And they sit on it. Is that notice? I would say it is not as a matter of law. And especially that it has to go to a principal. And in this case, there can be no argument that when Metrolinx gave notice to Associated, they thought they were giving it to Metrolinx. And how do we know that? Because the person that gave the notice testified, Mr. Harrison. And he said, one, I was unaware of any relationship between Associated and First Chicago, so therefore he couldn't have thought he was going to get to First Chicago. Two, he agreed with Associated not to tell the insurance company in order to protect their premiums. And again, I cited all the case law that says once you have that agreement, there can be no agency relationship. There is no agency relationship that has been proven in this case. And again, the burden of proof, and with all due respect to the court, we're asking questions. I want to answer the questions, but I don't want to. I certainly hope the court's not saying that I have the obligation to prove the lack of agency. And they have a proven agency. You're going to, you know, you do not. But the question is, what is the evidence, you know, in the record? I mean, in this insurance policy, the agent's name is listed. Okay. The agency's name is listed as the broker. The broker. And it refers to, I mean, if you, if this is your record. And there are hundreds of cases, not just a few, hundreds of cases where notice to the broker is notice to the company. Notice to the broker is notice to the company if the broker is determined to be the actual or apparent agency. There's no question here we don't have, there's no question we don't have an actual agency. They can try to argue it, but contracts between themselves. So even if they're an apparent agency, you can't have an apparent agency. Without this reliance. And then you have a conspiracy not to tell the principal. But do you have a case about this conspiracy? I've cited 10 cases in my brief. Well, I mean. They all stand for the same proposition, Judge. I can read you the quotes from the cases. It's on the end of my, you know, the end of my brief. Excuse me, the end of my brief. And I quoted the cases. USCO Industries? There's every case that I could find on this issue. Wilson versus Edgeworth? And if you read the quotes from the case, they're basically saying when a person gives information to an agent and agrees with that agent not to transfer that information to the principal, there is no agency relationship. It's fraud. It's pure and simple. You'd be condoning fraudulent conduct. And I know this court's not going to condone fraudulent conduct. There's no other age or business. That doesn't mean that your company doesn't have an action against the agent. No, it means that there's no agency relationship. I don't have an action against the agency because of that. To establish apparent agency, the plaintiff must prove first that the principal or his agent acted in a manner that would lead a reasonable person to believe that the individual alleged fault was an employee or agent of the principal. Yes. And you don't have that here. There's no evidence presented here. He always talked to his broker. The broker always filled out the accident reports. I mean, you know. As his agent, as he testified to, Judge, he testified. I understand your question, but we can't ignore the testimony of Mr. Harrison. Mr. Harrison said that all of these things that you're referring to were done for his benefit as his agent. He said associated with his agent. But your company knew this, and they acquiesced in the past. They allowed this to happen. I can tell you, Judge, unequivocally, there's nothing in the record to show that we knew that this accident occurred and that they were wrong. We have nothing in the record to show that this happened in the past. We have no record of that. If that were the case, his agency agreement would have been terminated immediately. Weren't there actual accidents that were given to First Chicago by MetroLift? Did they? Yes, four. Four. On four occasions, they went directly to First Chicago and notified of an accident. And in this one, they went to associated and said, let's just wait and see what happens. And unbeknownst to him, which we learned at trial, Mr. Harrison testified that there were even other accidents that he didn't report. That's not necessarily relevant, but it goes to show what is intent of his mind. All right. Please try to wrap up, and then we'll give you some time and rebuttal. When we're talking about agency relationship here, I think the key thing is, what was the intent of MetroLift when they notified associated of the accident? To figure out what that intent was, one need only look at the testimony of Mr. Harrison. Mr. Harrison testified unequivocally that he told associated, and they conspired, I hate to use that word, they conspired not to tell MetroLift because they didn't want the premium to go up. The intent at the time that he gave notice was not to give First Chicago notice, but the intent was actually to keep notice from First Chicago. It cannot be argued otherwise, because the evidence does apply. The court alone made a mistake here and ignored that critical portion of testimony. My time is up. I'll save the rest of my time for the court. All right. Thank you. Mr. Lansing. Good morning, Your Honor. May it please the Court. I was thinking last night, and I hesitate to go in this direction in the past because I think your first questions about who's an insured are really the most pertinent. Michael Mulder was insured from the outset. Had that been raised from the outset, this matter would have been decided. It would have been decided years back rather than going on and on and on about complex issues of notice and factual disputes and discovery. It was only after we found in discovery that First Chicago owed bonuses to Associated for keeping its profits high and its payouts on claims low. I thought about the word last night, producer. I always was kind of stumped by this word, producer. I don't know. You have an insurance broker. You're the insured. Do you have a producer? Of course not. The producer produced two things for First Chicago. It produced the policy. It sold the policy, fair enough. It also produced profits. And it produced profits in part by not passing on notice of claims. It had an incentive, a financial incentive provided by First Chicago in its bonus agreement, separate bonus agreement between First Chicago and First Chicago, in other words, its marketing arm, the ICE agency, and Associated. Essentially, it's a little more complex, but essentially if the payouts on claims were below 50% premium income, then there would be no bonuses due to Associated. And if it went lower and lower, down to, I forget, maybe 28%, Associated's bonus would rise and rise. It would have a greater percentage. But how is any of that relevant in this case? Who is the agent? Well, of course, Associated was First Chicago's agent, and to the extent they could argue. And they were also Metrolinx's agent, weren't they? Absolutely. In the Burgos case, the Supreme Court recognized you could have a dual agency. I would say that more apt characterization of the relationship was a double agency, because First Chicago was a secret. Metrolinx was never told Associated had an interest in discouraging claims. First Chicago paid Associated bonuses, didn't tell Metrolinx. Harrison, he's not the owner and the president, he was the treasurer, testified, that would be relevant information. It would somehow affect their judgment. Of course it would affect. How would Harrison rely? He would rely in a very simple fashion. I believe our agent, he recognized that Associated was their agent, he didn't know about the relationship with First Chicago, would steer us right. They would make sure the coverage is intact. But didn't they both agree, Harrison and Mr. Bankowitz, if I'm saying his name wrong, I apologize, didn't they agree they weren't going to submit this claim to First Chicago? I don't think it was quite an agreement. It was unclear exactly what the conversation was, but it was along the lines of, oh, we decided to wait and see. All right. So what does that mean? That means they decided to wait and see. Can they do that? Don't they have to give notice? Isn't there a requirement that they notify the insurance company of? Absolutely, and Associated, as the trusted advisor of Metcalfe, had the duty to say, look, to keep the policy intact, to keep coverage intact, you've got to tell First Chicago of any incident. This could be his claim. And you've got to tell them. And it should have done that. Baskowitz was at fault. Did Harrison ever say he told him to do that? He said, I thought he had his testimony. Harrison said they relied on Associated to steer them straight and to give them. Why did they give notice to First Chicago on other occasions then? Were those claims they really wanted to make sure got to First Chicago? It's an interesting question because First Chicago didn't have records for a number of things. They didn't keep the records of who gave them notice all the time. They said they only had the record of the first party that gave them notice. Didn't Harrison agree, or wasn't there testimony to support the idea that in the past, Metrolift had supplied or had provided notice of other claims directly to First Chicago? First Chicago maintained that. I believe Harrison said, well, we notified Associated, and Associated notified First Chicago. First Chicago ultimately admitted in discovery, gee, we might not keep record of the fact that Associated told us because we only keep record of who first told us. But the thing is, I hate to even go off on this because it is a tangent. Well, isn't this a case of apparent agency? Well, we contend, I think it's true, that First Chicago is both the apparent and the actual agent of First Chicago. But the agency drops out. The reason why an apparent agency drops out and everything, all that is irrelevant sideshow, the reason is because Mulder had no duty to give notice. Mulder was covered under the policy. Let's talk about how he was covered. Under the non-owned autos, it clearly states that it is an auto owned by the employee or a member of his or her household. How can we conclude that when the testimony, and there's really no debate on this one, that this auto was not owned by a member of Mr. Mulder's household? He said he wasn't living with his mother. Right. And as Your Honor pointed out, ambiguities in insurance contracts. Right. We read in favor of coverage. Well, what does it say? First of all, Provision 8, well, 8 has nothing to do with the ambiguities. Okay. But Provision 9 of that deck page, the coverage form, says that all of those autos you do not lease by a rent-filer, they're used in connection with your business. That's the non-owned autos. It says this includes. It doesn't say this excludes everything else. It doesn't say this only includes it. This includes autos owned by your employees or members of your household. So it includes it. What case would you cite for us to say that the interpretation of this particular provision, only those autos you do not own, and that this includes autos owned by your employees or members of their household, which case would you refer us to to say that this has been interpreted as an ambiguous clause such that if the employee says, it was my mother's car, but I don't live with her, that we should interpret it the way you're suggesting? Based on Your Honor's encyclopedic questions, I could say P versus Benson. But I haven't read it, so I can't claim to recommend it. I gave you that case. Neither one of you cited it. It's a case exactly on point. And it's very disturbing from my point of view when that is not cited. Yes, I'm sorry. I did not cite it. I didn't see it. My fault. What about the other issue with regards to Metro's business? Was it using the vehicle at the time? Yes. In the first sentence, I believe the first sentence of this court's prior decision, it notes that Mulder was on his way to a job site, as he testified this time, and the job site was of a customer of Metrolift. Metrolift sold hydraulic lifts and other heavy equipment. It didn't have its own construction sites. So Mulder was off to do his sales work for Metrolift and, in the process, had that crash. Of course it was a vehicle used in the process of the work. He said it. He said, yes, I was working. And First Chicago had the opportunity in cross-examination. Say, Mr. Mulder, weren't you just leaving home or whatever, or want to prove? It didn't bother. It didn't bother. And now it says we've got the burden of proof. It's nonsense. We don't have the burden of proof on that. We established that Mulder was working on his way to a customer's job site when the crash happened. And he was driving his mother's vehicle. And, again, the ambiguity on provision of mine, the coverage that Metrolift purchased, talks about how it's inclusive of autos owned by your employees and partners and members of their household, but only while used in your business, while used in your business. That's the case. We have evidence of that. And it includes autos. Well, I disagree with you against one point. The burden is not on the defendant. The burdens are on the plaintiff to prove their case. And if you want to show that something is in the course and scope of somebody's employment and they're using it for work purposes, you have to have evidence. The counsel here says that the only evidence is that he was driving to a work site. Is that sufficient? That's what the issue is. Is that sufficient? Well, first of all, Mr. Carver is a plaintiff here. It's seeking the declaratory judgment. Well, it's a declaratory judgment. I'm talking about the proof of what is work and what is not. And he said, I was at work driving to a construction site, a client's construction site, when the crash happened. Okay. And you say that's sufficient. I do. I mean, first, Chicago had the opportunity to come up and say, Mr. Moeller, really now, you were really just driving from home. And what you were driving at work, really. And to raise questions concerning that, didn't do so. The evidence is there. It's sufficient to show that, and especially given the… Well, aren't you now switching the burden of proof to them? No. They have their plaintiff. They have the burden of proof separately. We had a trial. This is not a trial now. We had a trial before Judge Griffin, who found that Moeller was an insured. Just as this Court previously found Moeller was an insured, except Judge Griffin found it after trial and after Moeller's activities on the day of the crash came out. He has a hard job to interpret what went on in that trial. See, that's the problem. I don't think we previously interpreted him as an insured. The question was whether or not there were questions of material fact. And I don't think whether he was an insured. At least Mr. Newman pointed this out earlier, that that was not one of the issues decided in our previous decision. It's in the decision that Moeller was an insured. Well, the way we said it was not. I don't think it was. And the reason it was important, the reason it was important, because, of course, the whole case focused on the issue, and I think a phony issue, of notice, because Moeller was an insured himself. And so we were gone for years about this notice issue. We continued with allegations that, you know, we somehow, First Chicago was defrauded by associate taxation. But the real thing, any kind of pollution, if there were that, was run out by First Chicago by paying, you know, additional bonus premiums to associates not paying the insured, and then encouraging the insured, admittedly, encourage MetroLift to make reports of accidents to its independent, professional independent insurance agent. That's what it said on the web, and that's what it said at trial. And, frankly, of course it would report that way, but it's an issue that's rather swept aside because on the first day of trial, suddenly, First Chicago comes up with a new defense. Oh, Moeller wasn't insured. They knew their own policy. They should have done that on the first day when they filed the declaratory judgment action. This matter would have been decided years ago, six years ago. Suddenly, it was filed seven years ago, and we wouldn't go on and on and on, draining the resources of the parties, draining the resources of the court, and wasting time. We think, as a matter of equity, it would be appropriate for this court to tell the next trial court that decides to, in any one case, consider the possibility of interest here, because, frankly, this was really unacceptable behavior by First Chicago, in my view. But on the issue of insured, First Chicago says they're not covered, Moeller's not, and the vehicle's not covered on any of the provisions. That if Moeller needed to be covered, they could have specifically, Metroleth could have specifically bought into a policy for Moeller and the vehicle, in terms of any auto. That's the argument that they're raising. Metroleth bought the Provision 9 coverage that included cars driven at work by employees that, when the cars were borrowed from members of their households or owned by the employees. Let me just argue that doesn't exclude the possibility that Moeller was borrowing it from his mother. I'm not sure I understand your question exactly, but that Metroleth purchased the coverage that applies here that made Moeller separately an insurer, and that binds First Chicago to defending Moeller and to indemnifying him if there is a judgment against him. Anything further? No, Your Honor. Thank you very much. All right. Mr. Newman, a brief rebuttal. Thank you, Your Honor. The first thing I want to point out is, as he did in his brief, counsel made a factual statement for which there was absolutely no support in the record. He said there was evidence of payments being made for bonuses to keep the cost down. I know you're all there to have that go home. It's normal to be yelling at you, but what? That there's no evidence of it. There is not any evidence that a single penny was ever paid to Associated from First Chicago for anything. I point that out in my brief. Not just bonuses. I'm talking even commissions. They didn't present any evidence, and that's the problem that I have from their case from day one. They make arguments. They make factual assertions, but they don't have any evidence of it. Nobody testified to it. Justice Reeves had pointed out one of the arguments that I'm making here, which maybe kind of got glossed over, is who is an insurer under the policy? It would be wonderful if there would be coverage under this policy. It's a two-pronged test under the policy. You have to be an insurer, and you have to be driving the covered automobile. Those are the two prongs. And then, of course, then you have the fulfillment rules, which you got compared to the complaint, which was never done in this case. But let's look at a brief moment on who an insurer is. Everyone glosses over this. An insurer is the named insurer, and this is where it ties into the non-non-bond model, which is, and I'm referring to page 2 of 11 of the insurance policy under Section 2 under liability coverage. It says the following people are insured. You, which in this case, as I point out, is Metrolinx. It's defined on page 1 of the policy, and it says anyone else. You know, you've already given us that argument, and you haven't read Pekin v. Benson, which interprets this policy, and that's unfortunate. Well, Pekin v. Benson interprets a policy from Pekin Insurance, not a policy from First Chicago. Pretty similar. And you say you're not aware of that case, that you didn't cite that case. I have not seen it. And you're arguing as to what something says without giving legal authority. Here's legal authority. I suggest you read that case. The legal authority that I'm providing is the legal authority that the court has to interpret the insurance policy as written. I cite the legal authority in there. This, for an insurer under Section 2, if you read what this says, it says your employee, if the covered audit is owned by that employee, which is not the case. That's the point I'm trying to make. It's not owned by him. He's not an insurer. Doesn't it say, or a member of their household? Or a member of the household, but that's not the case here either. Neither one of those facts are true. So an employee can become insured. Well, if the Pekin case suggests that an employee is driving his mother's car, okay, and he wasn't living with the mother at the time, and that case interpreted language very similar to this, would that surprise you? It would surprise me. It would surprise me greatly, that if it had the same language that this has. Yeah, similar language. I will tell you that I represent a lot of insurance companies. This language here is very specific that I haven't seen in any other policy. And I apologize now that you read the Pekin case. I did the research. It didn't come up. But I told you I would provide your Honor the question you had asked me in the case file, which I cite on page 6 of my reply brief, regarding driving a car to work. And it's a case that I cite as Kinney v. Continental Insurance Company. And this is a quote, and this is how I read it. It is well said that the general rule of law is that accidents which occur while an employee is going to and from his employment do not arise out of his course of employment. All that is testified to today, or in the trial, was that he was going to his place of employment. There was nothing else established. So when you ask what else needs to be established, if you look at this case, and this case also lists the exceptions to the rule. And what was the name of that one again? It's in your brief. Kinney v. Continental Insurance, 4203263. That's in your brief. That's in my brief on page 6 of my reply brief. Yes, all right. Merely driving to work isn't enough. And you have to have – there's got to be more. There are exceptions. And I will tell you when you look at the exceptions what it boils down to, which is going to make sense. Control, because it's an agency issue. It's control. And there was no evidence at all presented by any of the parties in this case that there was any control over Mr. Mulder when he was driving to a job site. Because it literally was two sentences. I was driving to a job site on behalf of Metro. Thank you. That was it. So for that reason, for the reasons that I've stated here, I have support to reverse, obviously, the trial court below. On all the grounds I raised, as I said, I will pick the issue that I think is the simplest. It's the agency issue with no alliance. But she doesn't even address the oral argument clause. Because if the court makes a determination that there was no alliance, the case is over. There cannot be an agency relationship. Thank you. Thank you. All right. The case was well-argued and well-briefed. We will take it under advisement. We're going to take a brief recess to call the next case in where we have to change our panel members. So take your brief recess.